## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

UNITED STATES OF AMERICA,       )
                                )
                   Plaintiff,   )
                                )
          v.                    )          NO. 2:15-CR-72
                                )
JEREMIAH SHANE FARMER,          )
                                )
                   Defendant.   )

## OPINION AND ORDER

In this extensive and protracted racketeering prosecution, Jeremiah Farmer was convicted at trial for his longtime participation in the Latin Kings street gang including the murder of two elderly men.  Mr. Farmer was represented by excellent counsel at trial but he now represents himself in these post trial proceedings and will do so at his upcoming sentencing.  This case is in front of me on a number of motions that, when read together, are motions for a new trial or motions for judgment of acquittal. My ultimate conclusion, as outlined below, is that Mr. Farmer received a fair trial and the evidence against him was sufficient for a jury to determine he was guilty beyond a reasonable doubt. As a result, there was no miscarriage of justice, and neither an acquittal nor a new trial is warranted.

### Procedural Background

Because of the age of this case and the protracted nature of the proceedings, a little bit of background is necessary to set the stage for the voluminous pending motions.  There were 38 defendants in this massive RICO prosecution of associates of

the Latin Kings.  Many other defendants were charged in separate cases.  Most

defendants in this case pleaded guilty but there were a couple of trials that occurred

along the way.  The trial of Mr. Farmer was one of those trials.  As explained more fully

below, at various points throughout this case, Farmer bounced back and forth between

representing himself and accepting the services of a court appointed attorney.

Sometimes he took the hybrid approach where standby counsel was appointed to assist

him while he was acting *pro se*.  In all, six attorneys have been appointed to represent

Farmer during the pendency of this case.

Fairly early in this case, Farmer gave notice that he intended to assert a defense

of insanity. [DE 1453.]  Shortly thereafter, Farmer moved to sever his trial from his co-

defendants. [DE 1495.] Because I believed Farmer's insanity defense gave rise to a

strong risk of prejudice to the other defendants who asserted they did not participate in

the alleged conspiracy, I found that severance was warranted and it was decided that

Farmer would be tried separately. [DE 1538.]  Later, Farmer withdrew the defense of

insanity. [DE 2011.] By this point in time, the fifth superseding indictment had already

been returned and Count One (the RICO conspiracy) contained the new allegations that

Farmer committed two murders (although the murders were not charged

substantively). [DE 1819 ¶¶ 26, 27.]  Because the fifth superseding indictment contained

a notice of enhanced sentencing, and the government indicated it needed to get

permission from Main Justice to not seek the death penalty for the murders, it seemed

prudent to keep Farmer's trial severed from the other defendants.  Closer to trial, the

government informed defense counsel and the court that it would not be seeking the death penalty in this case.

There was an initial concern about Farmer's competency and that was reviewed early on in the case.  A forensic report was prepared, and at a hearing on August 9, 2017, Magistrate Judge Andrew Rodovich found Farmer competent to stand trial and able to assist in his own defense.  [DE 956.]  Thereafter, the case lumbered along until July 2019 when a ten-day jury trial was conducted.  Farmer was found guilty of a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and in answer to a special interrogatory, the jury unanimously found Farmer committed the murders of Marion Lowery and Harvey Siegers while committing or attempting to commit criminal gang activity.  He was also found guilty of a drug conspiracy in violation of 21 U.S.C. § 846.

During the trial, Farmer was represented by appointed counsel Gregory Mitchell and Thomas C. Brandstrader.  Even though the government indicated shortly before trial that it would not be seeking the death penalty, I exercised my discretion and allowed Mr. Brandstrader to remain in the case as second chair as he had earlier been appointed as learned capital defense counsel and had climbed a significant learning curve on the case.

After the conclusion of the trial, on September 6, 2019, Farmer filed a motion for substitution of counsel stating he had irreconcilable differences with Mr. Mitchell which resulted in a total lack of communication. [DE 2261.] While that motion was still pending, on September 27, 2019, Mr. Mitchell filed a motion for new trial. [DE 2291.]

He argued that: (1) the evidence introduced concerning Farmer's alleged attempted murder of Katrina Coffman constituted an improper constructive amendment to the indictment by the government; (2) there was a lack of substantial evidence to find Farmer guilty of the murders of Harvey Siegers and Marion Lowery; and (3) I failed to properly instruct the jury when I did not give the "corroboration rule" instruction.

A few months after the trial, Magistrate Judge Rodovich held a status conference to take up Farmer's request to represent himself. This occurred on October 4, 2019. [DE 2304.] Despite Judge Rodovich's warnings about the difficulties of representing himself, Farmer elected to (again) go pro se. [*Id.*] Farmer was also given a deadline within which to amend, supplement, or withdraw the motion for new trial filed by his previous counsel, Mr. Mitchell.

Subsequently, Farmer asked for counsel to be appointed again. [DE 2401, 2404.] I held a conference in this matter, and after hearing from Farmer, granted his request for the appointment of new counsel. Ms. Ambrosio filed her appearance on behalf of Farmer on January 13, 2020. [DE 2461.] But less than a month later, Ms. Ambrosio moved to withdraw. [DE 2491.] Following another hearing, and after listening to Farmer's request that he once again proceed pro se, and warning him about the consequences of representing himself pro se, I granted his counsel's motion to withdraw and granted his request to proceed pro se. [DE 2499.] I also ordered that Farmer would be provided a paper copy of his transcript at the Chicago MCC and he could maintain the copy in his cell for legal work on his case. [*Id.* at 1.] He was also

4

given a copy of the docket sheet and the motion for new trial filed by his former counsel, Mr. Mitchell.  [*Id.*]  Farmer was given additional time to file a supplement to the motion for new trial since he was now pro se.

What followed was a flurry of paperwork filed by Farmer over the next few months including multiple lengthy documents actually referring to the Rule 29/33 motion including "Defendant's Supplement for Rule 29 and Rule 33" [DE 2505], "Motion and Incorporated Memorandum of Law in Support of Judgement of Acquittal or in the Alternative a New Trial and Supplement This Rule 29 and 33 " [DE 2512 which is 188 pages long], "Motion for a Judgement of Acquittal and Motion for a New Trial" [DE 2513 which is 264 pages long], a motion for a 30-day extension of time to file his supplement which was granted [DE 2591, 2593], "Motion for His Supplement Rule 29 and Rule 33" [DE 2610 which is 147 pages long], "Motion Supplement Rule 29/Rule 33" [DE 2638 which is 30 pages long], and twelve more supplements to his Rule 29/Rule 33 motion [DE 2641, 2642, 2643, 2644, 2648, 2656, 2657, 2668, 2672, 2681, 2682, 2684], as well as numerous other motions interspersed therein with titles like "Motion - Government Conspiracy" [DE 2708] that also relate to Farmer's request for acquittal or a new trial. The government filed an omnibus response on August 10, 2020. [DE 2713.] After receiving an extension of time, Farmer filed a 253-page reply on September 21, 2020. [DE 2751.]

All told, there are more than 90 motions currently pending that Farmer filed pro se, and approximately 61 of these motions relate to his request that I enter a judgment

of acquittal or grant a new trial.  Many of the motions exceed the page limit by leaps

and bounds, many contain confusing arguments and unrelated facts, and many are

repetitious.  I have done my level best to try to address all of the cogent arguments

Farmer has made (and that Mr. Mitchell originally made) that relate to his motion for a

new trial or acquittal.  The other remaining motions seemingly unrelated to the motion

for new trial will be dealt with by separate order.

## Factual Background

The government filed a lengthy response in opposition to all of Farmer's filings.

[DE 2713.]  In it, the government spends over twenty pages just covering the facts of

this case and readers are encouraged to review that memorandum for a detailed

understanding of all the facts at issue.  But for expediency sake, I will summarize just

those facts of the case that are particularly relevant to the pending motions.

The evidence at trial showed that Farmer was a member of the Latin Kings, a

Chicago-based street gang, with local sets or "hoods" in Hammond, Gary, and East

Chicago.  The Latin Kings are a highly organized street gang with a written manifesto, a

distinct hierarchy, and established rules.

Members of the Latin Kings committed acts of violence including murders,

shootings, arsons, and beatings to protect their territory, and they were involved in an

expansive drug trade as well.  The Kings had a common gang sign (a five-point crown).

Members had to "post up," or do rounds around the neighborhood, and "put in work"

by selling drugs, committing robberies, and beating and killing rival gang members.

This violence was referred to as "licks" or "rips" and was used to protect the Latin King territory from rivals.  Rivals included other gangs like the Latin Dragons, Latin Counts, Gangster Disciples, Black Disciples, Spanish Vice Lords and the Two Six.  "Putting in work" against rivals increased the chance of becoming a Latin King and gave members more "sway" in making decisions in the Latin King neighborhood. The Latin King members were also required to attend meetings and pay dues.  Future members were recruited by the Latin Kings from local neighborhoods and elementary schools.  There was also testimony at trial that the Latin Kings remained active in the Indiana prisons, with members assaulting and stabbing offenders, cooperators, and prison staff members.  Latin King members also participated in drug and cigarette smuggling into prisons.

No less than twelve witnesses (seven Latin King witnesses: Keith Manuel, Gabriel Jalomos, Glen Kok, Oscar Gonzalez, Jason Gibbs, Edward Januszewski, and Alexander Vargas; and five additional witnesses: Katrina Coffman, Joe Gursky, Tiffany Malinauskas, Robert Davis, and Jack Farmer) identified Farmer as a Latin King.  These same Latin King witnesses testified Farmer was involved in gang activity and they knew him to "post up" with guns, shoot at and beat rival gang members, throw gang signs, give the Latin King handshake to other members, attend meetings, pay dues, purchase cocaine, distribute narcotics, sell guns, shoot at snitches, commit "licks" for cash and drugs, and beat up other drug dealers.  There was also evidence presented at trial, including taped prison telephone calls, that Farmer remained an active Latin King

7

member while in prison and that his tattoos (including a lion, King Master, crown, and two filled in teardrops), identified him as a Latin King.

The murders of Marion Lowery (who was in his 70's at the time) and Harvey Siegers (who was in his 60's), took place on June 25, 1999, at approximately 11:43 a.m. Those men worked at a body shop named Calumet Auto Rebuilders near the Hammond courthouse, at 5105 Calumet Avenue. At trial, a United States Postal Service mail carrier by the name of Clarissa Holodick testified she was working that day when she saw a white male with a panicked face running from the area of Calumet Auto Rebuilders while holding something in his hand. Later that same night, Holodick assisted law enforcement in completing a composite sketch of the male she saw running. The sketch was put on fliers and distributed around the area.

Law enforcement recovered a pair of gold tone Oakley sunglasses from the scene. In a nearby alley, they also found a blood-stained sledge hammer and a blood-stained dollar bill. The DNA profile from the hammer had a mixture from which Lowery and Siegers could not be excluded as possible contributors, but no DNA from Farmer or fingerprints of his were found at the scene or on any objects.

The scene of the murders depicted a blood bath caused by an extraordinary degree of violence. Dr. Mitra Kalelkar testified at trial that the victims died from extensive head and face injuries due to blunt force trauma and that a hammer could have caused the injuries. Lowery had extensive skull fractures and scalp and brain lacerations. Siegers had extensive facial and skull fractures and a lacerated right

8

eyeball.  Importantly, law enforcement did not release information about the case or photos of the victims' injuries to the public.

One might reasonably wonder what the motive would be for a Latin King to commit two violent murders against a couple of elderly men running a body shop.  The government provided the answer at trial.  Former Latin King Glen Kok gave very specific trial testimony about the murders.  He testified that a Latin King by the name of Byron Wren told Kok that Farmer believed Lowery and Siegers saw Farmer commit a shooting in the neighborhood a few days earlier, so Wren and Farmer went to the business to make sure they kept their mouths shut. [Trial Transcript "Tr.," 787-91, 794.] In other words, according to the government, Farmer was trying to silence potential witnesses to an earlier Latin King related shooting.  Wren, who was the lookout for Farmer, told Kok that after Farmer entered, he heard yelling so he fled. [Tr. 789-90.] Farmer later told Wren that he picked up a hammer and hit the victims with it. [Tr. 790.] Later, Kok specifically confronted Farmer about the murders.  He asked Farmer what happened. Farmer confirmed why he and Wren went to the auto builder shop, and said he grabbed a hammer and hit both men with it. [Tr. 792-93.] Consistent with the testimony of Postal Worker Holodick, Farmer told him he then fled the business with the hammer and some money. [Tr. 793-94.]

Former Latin King Jason Gibbs also testified about the auto body shop, which was in Latin King territory, and that during the months leading up to the homicides, several Kings, including Farmer, thought the victims were snitches because they had

been talking to the police. [Tr. 1001-05.] A few days after the incident, Farmer told Gibbs that the victims were in King territory and "should have known better." [Tr. 1016.] Farmer also told Gibbs he used a hammer from their business to beat them, and he did it because they were snitching. [Tr. 1018-19.] Farmer also gave the chilling statement to Gibbs that it felt "surreal" and good to hit someone and "feel their bones break" and "jaw and teeth shatter," and that he hit someone so hard that their eyeball fell out. [Tr. 1017-18, 1100.]

Gibbs also had information about the sunglasses that were found at the scene. He testified about a month before the murders, Gibbs was with Farmer when Farmer purchased a pair of knock-off Oakley sunglasses. [Tr. 1025-26.] Gibbs tried them on and put a scratch on the lens. [Tr. 1026-27.] Gibbs identified the Oakley sunglasses recovered from the scene. He knew they were Farmer's because they had a scratch on them that he had put there. [Ex. 20A; Tr. 1031-1032.]

Farmer was arrested for the murders in May 2001 by the Hammond Police Department.  During the booking process, Farmer voluntarily asked the detective if it was a lethal injection case and stated, "I want lethal injection.  I may as well say I'm guilty and get it over with." [Tr. 1286-87.]  During the state case, the Latin Kings identified Kok and Gibbs as witnesses against Farmer, and thereafter, the case  started to fall apart.  Both Kok and Gibbs were harassed and threatened that they would be killed if they testified against Farmer. After being beat up and fearing for his life, Kok recanted his statement to the police regarding the murders. [Tr. 797-806.] Relatedly,

10

after receiving threats and fearing for his family's safety, Gibbs quit cooperating against Farmer. [Tr. 1037-39.] The state prosecution was ultimately dropped because of the lack of witnesses willing to testify.

Going back to the trial in this case, Farmer's former girlfriend, Tiffany Malinauskas, provided very believable and convincing testimony against Farmer. She was with Farmer when he saw the flier with the sketch on it. (This is the sketch that Postal Worker Holodick helped draw the night of the murders.) According to Malinauskas, the sketch was exactly how Farmer looked back in June of 1999. [Tr. 1214-15.] A few days later, after Farmer's father drove them both to Daytona Beach, on the return trip, Farmer admitted to Malinauskas that he panicked when he saw the sketch because he had killed two men with a hammer, he mentioned doing it for drug money, and he was scared because he dropped his sunglasses. [Tr. 1223-25.] Malinauskas also testified that she drove Farmer to different locations to get drugs, including across the state line to Chicago, and that Farmer picked up about 15 kilos of cocaine in her presence. [Tr. 1204-06.]

There were other people who testified against Farmer too. For example, Robert Davis testified Farmer told him he was hiding out from the Hammond Police because he had killed two men. [Tr. 1387, 1390.] Farmer told Davis, "I went into the garage, had a sledgehammer, and hit the guys." [Tr. 1391.] Jimmy Gilliam testified that while at a party, he heard Farmer talk about how his two colored-in tattoos represented people he had killed. [Tr. 1823-24.]

11

Several other racketeering acts related to the activities of the Latin Kings were testified to at length during the trial. For example, Farmer hit an acquaintance named Joe Gursky with a crowbar across his eyes, pointed a gun at him, and then robbed him. [Tr. 642-89.] Additionally, Katrina Coffman testified she was associated with the Gangster Disciples (a rival gang of the Latin Kings) and selling marijuana for them when Farmer and another person broke into her house, demanded the drugs and money, then shot Coffman in her stomach and her boyfriend in the back. [Tr. 501-24.] Coffman recognized Farmer's voice, his eyes, and his tattoos, and when he left, he looked at Coffman, took off his mask, and shot her again. [Tr. 524.]

**Actions Taken by Farmer's Trial Counsel**

Farmer's attorney, Mr. Mitchell, was appointed in January 2018 and strenuously represented Farmer during the proceedings before me. Prior to trial, defense counsel filed the following motions: a notice to assert a defense of insanity [DE 1453] (which was ultimately withdrawn), a motion for immediate disclosure of *Brady/Giglio* material for Jason Gibbs and Tiffany Malinauskas [DE 1956], a notice of an alibi defense [DE 2002], a motion to suppress the police sketch upon which I held a hearing [DE 2009], a motion to sever the murders from the RICO conspiracy [DE 2019], a motion in limine to bar evidence and testimony of witnesses and autopsy photos [DE 1981], and proposed jury instructions [DE 1983].

During trial, Mr. Mitchell and Mr. Brandstrader vigorously cross-examined witnesses. For example, they explored the criminal history of witnesses, their previous

12

drug use, prior inconsistent statements, and their motives for testifying against Farmer. Law enforcement officers were cross-examined on their failure to connect Farmer to the murders earlier, whether Farmer's conduct was in furtherance of the RICO enterprise, whether Farmer held a rank with the Latin Kings, and whether he conspired with other Latin Kings.  Through stipulations, Farmer's counsel presented evidence that Farmer's DNA and fingerprints were not recovered from any of the evidence in the case - including the sunglasses and hammer.  Throughout the trial, defense counsel raised a number of objections, many of which were sustained. [Tr. 273, 341, 510, 518, 531, 648-49, 650, 805, 842, 885, 904, 920, 980, 994-95, 999, 1002, 1004, 1008, 1011, 1178, 1271-73, 1275-77, 1423, 1474, 1722.] Even in closing arguments, I sustained defense counsel's objection to the government using a photograph of Farmer to be compared with the police sketch because the photo had not been identified by a witness. [Tr. 2052-59.]

Farmer's counsel also called six witnesses in its case-in-chief.  Alexander Vargas, also a Latin King, testified that he had met Farmer only once and did not know him to hold any rank in the gang. [Tr. 1443.] Because much of the evidence against Farmer was based on incriminating statements he allegedly made to others, it was important for the defense to try and blunt that testimony. In that regard, Dr. Bernard Glos was called as an expert witness and testified that Farmer suffered from personality disorders that caused him to brag and try to impress others. [Tr. 1609-12.]  As for the sunglasses left at the scene, Stacy Watts testified for the defense that another person had a pair of sunglasses like the ones found at the scene. [Tr. 1457-58.]  Edward Januszewski testified

that he knew Farmer back in June 1999 and Farmer didn't wear Oakley sunglasses like the pair found at the auto body shop. [Tr. 1465, 1470.]  Jack Farmer, the defendant's father, testified about his son's troubled youth and that he, Tiffany, and Farmer were traveling to Florida when they learned about the murders. [Tr. 1571-76.] Detective Thomas Grabowski testified about his role in the investigation, including that there were other suspects at the beginning and none of the eyewitnesses in 1999 identified Farmer from a photo lineup as the person that fled from the business. [Tr. 1686, 1702-04.]

## Discussion

### Rule 29 Motion

Federal Rule of Criminal Procedure 29(c) provides that a defendant may renew a motion for judgment of acquittal after a guilty verdict, and "the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(1), (2).  In other words, Farmer may renew his motion even though I already denied his previous motion made during trial at the end of the government's case.  [Tr. 1428-29.]

In ruling on a motion for acquittal, I must determine whether, at the time of the motion, there is relevant evidence from which a jury could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government.  *See United States v. Studley*, 892 F.2d 518, 526 (7th Cir. 1989); *see also United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010).  I also have to bear in mind that "it is the exclusive function of the jury to determine the credibility of

14

witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (quotation omitted).  The inference of guilt of a criminal offense may be created by either direct or circumstantial evidence, and circumstantial evidence is of equal probative value to direct evidence.  *Studley*, 892 F.2d at 526.  A jury verdict "may be rational even if it relies solely on circumstantial evidence." *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009).  All reasonable inferences that can be drawn from the evidence are viewed in the light most favorable to the government.  *Studley*, 892 F.2d at 526.  Under Rule 29, Farmer faces "a nearly insurmountable hurdle" since I must "defer to the credibility determination of the jury and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."  *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (quotation omitted); *see also United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008) (courts defer to the jury's credibility determinations).

Let's turn to the merits of Farmer's arguments.  Although it is somewhat difficult to decipher, Farmer seems to argue in several motions that the government failed to show the Latin Kings were an enterprise that engaged in racketeering activity. [DE 2512 at 160-62, 171-73, DE 2610 at 55.][1]  For the government to prove Farmer was guilty in

---

[1] I have tried to make some citations to Farmer's arguments for illustrative purposes, and to try to keep the record clear.  But many of his arguments are repeated in numerous filings, and so these examples of citations to his arguments are by no means exclusive.  It would be a gargantuan task to cite every time Farmer makes certain arguments in the thousands of pages of filings submitted to the court.

violation of 18 U.S.C. § 1962(d) (Count One), it had to establish: (1) the charged conspiracy existed; (2) the defendant knowingly became a member of it and intended to advance it; (3) the conspiracy was an agreement to conduct the enterprise's affairs through a pattern of racketeering; (4) the enterprise was the Latin Kings; and (5) the Latin Kings' activities affected interstate commerce. [Tr. 2082]; *see also United States v. Olson*, 450 F.3d 655, 664, 668-69 (7th Cir. 2006).

There was sufficient evidence presented at trial that the Latin Kings were an enterprise engaging in racketeering activity. An enterprise includes any association or group of individuals associated in fact. 18 U.S.C. § 1961(4). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). While the central element of an enterprise is structure, the Seventh Circuit has held that with informal organizations such as criminal groups, there "must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) (quoting *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994)). It is enough to show a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quotation omitted).

Although each case must be decided based on the evidence presented at that trial, it is worth noting that the Latin Kings have been found by many courts to constitute an enterprise. *See, e.g., United States v. Amaya*, 828 F.3d 518 (7th Cir. 2016);

*United States v. Gonzalez*, 765 F.3d 732 (7th Cir. 2014); *Olson*, 450 F.3d at 669-73; *United States v. Tello*, 687 F.3d 785 (7th Cir. 2012); *United States v. Guzman*, No. 08 CR 746-11, 2011 WL 4702186 (N.D. Ill. Sept. 29, 2011) (denying motions under Rule 29 and Rule 33).

The Seventh Circuit recently affirmed convictions and sentences of defendants in an analogous case involving the Hobos street gang.  *See United States v. Byron Brown et al.*, Nos. 17-1650, 17-2854, 17-2858, 17-2877, 17-2899, 17-2917, 17-2918, 17-2931, 17-3063, & 17-3449, 2020 WL 5088074 (7th Cir. Aug. 28, 2020).  There, the Court found there was sufficient evidence of a RICO enterprise:

> Together the defendants worked to control an exclusive territory.  They earned money through drug dealing and robberies, protected each other, and killed rival gang members and others who posed threats, including government cooperators.  Many witnesses testified that the gang was a distinct, identifiable group. . . . [t]he jury also heard evidence about the defendants' cooperative drug trafficking. . . . [t]he Hobos also showed their unity through tattoos and hand signs. . . . we have no trouble concluding that the evidence before this jury was sufficient to establish a RICO enterprise.

*Id.* at *4-*5.

The same is true here. The jury heard ample evidence that the Latin Kings were a group of people associated together for a common purpose – they were a hierarchy organized by a set of rules and a written manifesto, the five point crown was their gang sign, they paid dues and had set practices regarding initiation, attending meetings, disciplining their own members, and engaging in violence in the name of the gang. They acted together to sell drugs, purchase guns, defend their territory, and fight off

17

rivals.  Several witnesses testified about the structure of the Latin Kings and the evidence showed that the Latin Kings shared money, drugs, and the power associated with being gang members.  Viewing the evidence in the light most favorable to the government, it is clear that a rational trier of fact could have found that the Latin Kings was a RICO enterprise.

Additionally, evidence shows the Latin Kings conducted their enterprise through acts of racketeering.  As mentioned earlier, six Latin King witnesses all testified the gang committed acts of violence including murders, arsons, shootings, beatings, robberies, and intimidation to protect their territory.  Proceeds from robberies went to pay dues and obtain more drugs and guns.  The Kings had a huge drug distribution operation involving fifty kilograms of cocaine, hundreds of pounds of marijuana, and alprazolam.  As such, there was plenty of evidence from which a reasonable jury could conclude that the Latin Kings were an enterprise that engaged in racketeering activity.

Farmer also asserts that the Government failed to prove that the activities of the Latin Kings "affected interstate commerce." [DE 2512 at 171-72.] This argument is a nonstarter since proof of even a *de minimis* affect on commerce will meet the government's burden.  *See* 7th Cir. Pattern Crim. Jury Instructions 18 U.S.C. § 1962 (definition of interstate commerce).  To establish this, the government had to prove the Latin Kings either made, purchased, sold, or moved goods or services that had their origin or destination outside of the state in which the Latin Kings were located, or that the actions of the enterprise affected in any degree the movement of money, goods, or

18

services across state lines. [Tr. 2086.]  There was evidence at trial that the government recovered from the Latin Kings gang firearms that had been manufactured outside of Indiana.  There was also sufficient testimony at trial that the Latin Kings and Farmer himself distributed cocaine which also came from outside of Indiana.  There was also evidence that the Latin Kings frequently crossed the Illinois/Indiana border to engage in gang activity.  In short, the Government readily proved Farmer had participated in an illegal enterprise engaged in and affecting interstate commerce. *See United States v. Benabe*, 436 F. App'x 639, 659 (7th Cir. 2011).

Farmer also argues that the government failed to prove he was a member of the Latin Kings conspiracy [DE 2504 at 104-07; DE 2505 at 1-4; DE 2512 at 85-89; DE 2513 at 3-4, 8; DE 2540 at 3; DE 2543 at 217-18; DE 2546 at 4-6; DE 2610 at 24, 55-56] and that he participated in the affairs of the enterprise through a pattern of racketeering [DE 2513 at 5; DE 2546 at 4-6; DE 2610 at 55-56]. Despite Farmer's protestations, there was an avalanche of evidence showing that he was a member of the Latin Kings conspiracy, even when he was incarcerated.  Seven Latin King witnesses identified Farmer as a Latin King that belonged to sets in Indiana and Chicago (Keith Manuel, Gabriel Jalomos, Glen Kok, Oscar Gonzalez, Jason Gibbs, Edward Januszewski, and Alexander Vargas), and an additional five witnesses testified Farmer was a King (Katrina Coffman, Joe Gursky, Tiffany Malinauskas, Robert Davis, and Jack Farmer).  As mentioned earlier, multiple witnesses testified that Farmer attended meetings, paid dues, participated in violations (or beatings) of other members, possessed guns belonging to

19

the Kings, posted up, shot at and beat rival gang members, showed the gang sign and did the Latin King handshake, did "licks" for cash and drugs, attended large "nation" events, supplied the Latin Kings with guns, and distributed drugs for them. His loyalty to the Latin Kings did not waiver, even in prison. There was ample evidence for the jury to conclude that Farmer acted as part of the conspiracy and participated in the affairs of the Latin Kings through a pattern of racketeering.

Farmer's next main arguments center around the murders. Farmer contends the government failed to prove that he committed the murders of Lowery and Siegers [DE 2405 at 7-10; DE 2512 at 172-72; 180-81; DE 2513 at 8, 258; DE 2610 at 135); failed to prove the murders were in furtherance of the Latin Kings RICO conspiracy [DE 2505 at 4; DE 2507 at 12; DE 2512 at 172-72; DE 2513 at 8; DE 2540 at 3; DE 2543 at 217-28], and that the murders were committed to increase or maintain his position with the gang [DE 2511 at 172; DE 2513 at 8; DE 2546 at 6-7; DE 2512 at 172]. He argues that because there was no DNA or fingerprint evidence on the hammer or sunglasses, or on anything else recovered from the scene, there was not enough evidence to prove he committed the murders. Mr. Mitchell makes a comparable argument in his motion for a new trial (which Farmer has cut and pasted into some of his motions), and insists the evidence was so insufficient on the murders that not only should Farmer get a new trial, but the court should enter a not guilty verdict notwithstanding the verdict pursuant to Rule 29(c). [DE 2291 at 10-13; DE 2405 at 8-10.]

The evidence relating to Farmer's involvement in the murders was strong but

not overwhelming.  It was, in my judgment, a pretty close case and hard fought on that issue.  But a jury's verdict "may rest solely on circumstantial evidence."  *United States v. Davis*, 859 F.3d 429, 434 (7th Cir. 2017) (quotation omitted).  And in this case, there was substantial circumstantial evidence implicating Farmer from which a reasonable jury could conclude that he murdered Lowery and Siegers, and that he did it to protect and further the Latin King enterprise.

Law enforcement never released details about the injuries inflicted, but Farmer nonetheless described to Gibbs shortly after the murder how good it felt to hit someone and feel his jaw and teeth shatter, and his eyeball pop out.  Farmer told Gibbs that he used a hammer from the auto body shop to beat them, and the injuries were consistent with this method of death.  This was not publically available information.  The sledge hammer recovered from a nearby garbage can in the alley had a presence of a mixture from which Lowery and Siegers could not be excluded as possible contributors, and one distinct profile in one sample was consistent with Lowery.

The mail lady, Clarissa Holodick, on the night of the murder assisted in making a sketch of the person she saw running scared from the direction of the car shop.  The sketch, and the release of it to the public, was important because there was also evidence that Farmer fled town after seeing the flier, and his girlfriend testified the image looked exactly like Farmer.  The girlfriend, Tiffany Malinauskas, also testified that a few days after the murders, Farmer told her he wanted to turn himself in because he had killed two men with a hammer and was scared because he had dropped his

sunglasses.

There was also evidence that Farmer bragged to several people about the murders. He told Kok that the victims were snitches and he grabbed a hammer and hit both of them with it. Farmer told Davis he had killed two men and described the method by telling Davis he went into the garage and hit the guys with a sledgehammer. Farmer told Gibbs the victims were in King territory and should have known better. Farmer further said he used a hammer from the business to beat them because they were snitching. Gibbs also identified the Oakley sunglasses recovered from the scene as Farmer's sunglasses. Moreover, Davis testified Farmer told him he was hiding out from the Hammond Police because he had killed two men and Gilliam testified that while at a party, he heard Farmer talk about how his two colored-in tattoos represented people he had killed. And finally, recall that upon his arrest by state authorities and while he was being booked, he told the officers "I want lethal injection. I may as well say I'm guilty and get it over with." [Tr. 1286-87.]

It is true that all of the witnesses (except Ms. Holodick, the mail lady) had axes to grind and were readily impeached during trial. Farmer points out things like some witnesses were former drug users, some lied in the past, some recanted previous statements, and some of the testimony was impeached or uncorroborated. And even Ms. Holodick's testimony about her memory of an event occurring some 20 years earlier was reasonably challenged by the defense. But the believability of these witnesses was the province of the jury, not me.

22

Farmer's already "heavy burden in the judgment of acquittal context - in which a verdict will be affirmed if *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt - 'becomes even heavier' where he is attempting to show insufficient evidence based on the unreliability of witnesses." *United States v. Zambrana*, No. 2:00 CR 28 TS, 2005 WL 1799525, at *3 (N.D. Ind. July 26, 2005) (emphasis in original) (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir. 1988)). The extremely narrow exception to the rule that issues of witness credibility are relegated to the jury "can be invoked only where the testimony contradicts indisputable physical facts or laws." *United States v. Kuzniar*, 881 F.2d 466, 470-71 (7th Cir. 1989); *see also United States v. Faulkner*, 885 F.3d 488, 493 (7th Cir. 2018) (holding a defendant can only prevail on his motion by attacking those witnesses' testimony by showing the testimony is "contrary to the laws of nature or so internally inconsistent or implausible on its face that no reasonable factfinder would credit it."). No such testimony was presented in this case. To the contrary, the matters testified about were both possible and plausible.

What's more, the Seventh Circuit has been crystal clear that these types of arguments about witness credibility (for example, Farmer's criticisms that some witnesses were also in a gang, or did drugs, or are not corroborated), are not sufficient to receive a judgment of acquittal. A jury is entitled to credit testimony even if it is "totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant." *United States v. Johnson*, 729 F.3d 710, 716 (7th Cir. 2013) (internal quotation omitted). A judgment of acquittal "is not required

23

because the government's case includes testimony by an array of scoundrels, liars and

brigands." *United States v. Grandinetti*, 891 F.2d 1302, 1307 (7th Cir. 1989) (quotation

omitted); *see also United States v. Stevenson*, 680 F.3d 857-58 (7th Cir. 2002) (ruling a

witnesses is not considered unbelievable by law merely because of drug use).

It isn't my role, but rather that of the jury, to consider the witnesses' motives and

credibility, and it is their job to review the credibility of a witness testifying pursuant to

a plea agreement, with a criminal background, and any other attending possible biases.

*United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992). All of these witnesses were

cross-examined at trial and all of these potential deficiencies in their testimony were

already brought out. It was up to the jury to sift through the evidence and determine

how much weight to give their testimony. To assist them in that process, I gave a very

specific jury instruction stating:

> You have heard testimony from Keith Trevor Manuel,
> Gabriel Jalomos, Glen Kok, Oscar Gonzalez, Jason Gibbs,
> and Alexander Vargas. Keith Trevor Manuel, Gabriel
> Jalomos, Oscar Gonzalez, and Alexander Vargas received or
> expect to receive a benefit in return for their testimony and
> cooperation with the government. Glen Kok and Jason Gibbs
> have admitted to lying under oath. In addition, Keith Trevor
> Manuel, Gabriel Jalomos, Oscar Gonzalez, and Jason Gibbs
> have pled guilty to, or stated that they were involved in,
> some of the crimes the defendant is charged with
> committing. You may not consider any of their guilty pleas
> as evidence against the defendant. You may give these
> witnesses' testimony whatever weight you believe is
> appropriate, keeping in mind that you must consider that
> testimony with caution and great care.

[DE 2160 at 12.] This instruction was appropriate and adequate.

Farmer claims that Task Force Agent Christopher Gootee committed perjury when he was questioned on cross examination about who was a Latin King member in 1999. [DE 2651; Tr. 144-150.] When asked "who were the members with Mr. Farmer in 1999 that's part of this Superseding Indictment? Who are they, in 1999?" Gootee answered, "I don't know." [Tr. 147.]   Gootee admitted he did not know if some of the people were members of the conspiracy at that time, but when questioned further about specific individuals, he did state who he thought were members of the conspiracy. [Tr. 148-50.] Farmer insists that this constitutes perjury. A witness commits perjury "if, while under oath, he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Vallar*, 635 F.3d 271, 288 (7th Cir. 2011) (quotation omitted). Gootee's testimony was not perjury because Farmer has not shown that it was false or that he intended to give false testimony. To the extent Farmer criticizes Gootee's qualifications, which he does in a number of motions and his reply brief [DE 2751 at 2], Gootee was subject to cross examination at trial and nothing about this argument warrants a different result in this case.

Taking into account all of the factual arguments Farmer makes in his multiple motions, so long as there are "two permissible views of the evidence," the factfinder's choice between them cannot be clearly erroneous. *United States v. Contreras*, 820 F.3d 255, 263 (7th Cir. 2016). Here there was sufficient evidence from which a reasonable jury could conclude that Farmer committed the murders, and that he did so to increase

his presence and worth in the Latin Kings gang.  *See United States v. Jarrett*, 447 F.3d 520, 530 (7th Cir. 2006) ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . . .").  In sum, considered together, there was enough for a jury to conclude that Farmer committed the murders, and did it in furtherance of the Latin Kings. And so for all of these reasons, Farmer is not entitled to a judgment of acquittal.

**Rule 33 Motion**

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly."  *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted).  A district court may "weigh evidence, evaluate credibility, and grant the motion if the substantial rights of the defendant have been jeopardized."  *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004) (citation omitted), *vacated on other grounds*, 546 U.S. 12 (2005).  A new trial is appropriate "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict."  *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (citation omitted).

In contrast to a motion under Rule 29, for Rule 33, a district court is not required to view the evidence in a light most favorable to the government, but rather must independently consider the evidence presented.  *Id.*  The standard for granting a new trial under Rule 33 is less strenuous than the standard for granting a motion for judgment of acquittal under Rule 29(c).  *See United States v. Alanis*, 265 F.3d 576, 591 n. 8

(7th Cir. 2001). Nevertheless, "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017) (quotation omitted). The court may only order a new trial if "the verdict is against the manifest weight of the evidence" and would result in a "miscarriage of justice." *United States v. Washington*, 184 F.3d 653, 657-58 (7th Cir. 1999).

Farmer has not come close to meeting his heavy burden of showing that the verdict is so contrary to the weight of evidence, that a new trial is required in the interests of justice. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). As with his motion for acquittal, I will try to address all of his arguments, even though they are spread out among multiple lengthy motions.

First, Farmer maintains that the government, as well as the court, improperly constructively amended the fifth superseding indictment. [DE 2405 at 2-7; DE 2503 at 10; DE 2505 at 12-14; DE 2513 at 6-7; DE 2528 at 4-5; DE 2546 at 2; DE 2610 at 24-25; DE 2751 at 28.] Mr. Mitchell made a similar argument when he was still representing Farmer in his motion for a new trial regarding the attempted murder of Katrina Coffman. [DE 2291 at 7-10.] Farmer himself claims the government constructively amended the superseding indictment because it did not include the shooting or robbery of Katrina Coffman or his distribution of kilograms of cocaine as overt acts. But Coffman and Tiffany Malinauskas testified about these events at trial. Farmer believes this was inadmissible Rule 404(b) evidence, and that the shooting/robbery of Coffman and going on drug runs with Malinauskas should have been included as overt acts in the

27

indictment.  These arguments ultimately fail.  I'll concentrate on the evidence that Coffman presented at trial first, since that was the most significant, and then I'll address Malinauskas's testimony about drugs next.

The admission of Coffman's evidence at trial did not constitute an impermissible amendment to the indictment.  Count One of the fifth superseding indictment correctly alleges each element of the crime of RICO conspiracy: it identifies an enterprise, Farmer's association with the enterprise, and that Farmer knowingly joined a conspiracy, to operate through an identified pattern of racketeering activity. [DE 1819]; *see United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991).  Moreover, it lists the individuals involved in the conspiracy as well as the state and federal law violations that constitute the racketeering activity.  It is true that Coffman's testimony is not specifically listed as an overt act in the fifth superseding indictment.  However, it didn't need to be.  "Neither overt acts . . . nor specific predicate acts that the defendant agreed personally to commit . . . need to be alleged or proved for a section 1962(d) offense."  *Id.*; *see also Salinas United States*, 522 U.S. 52, 63 (1997) (stating an indictment charging RICO conspiracy need not set forth any specific overt acts).

Farmer could not have been caught off guard by Coffman's testimony regarding the shooting/robbery.  Mr. Mitchell argues in his motion for a new trial that "[a]t trial however, the government without prior notice or disclosure, presented chilling evidence on the third day of trial, that defendant Farmer, had committed a cold-blooded, attempted murder on Karina [sic] Coffman on February 24, 2009, by shooting

28

her with a gun in the abdomen at close range." [DE 2291 at 8.]   The argument that this

evidence was offered without prior notice is incorrect. On March 13, 2018, the

government filed a Notice of Intent to Introduce Enterprise Evidence. [DE 1390.]  In the

notice, the government specifically stated that in regard to defendant Farmer, it

intended to introduce evidence that:

> On February 24, 2009, Jeremiah Farmer entered the
> residence of an acquaintance in Gary, Indiana.  Farmer
> pistol-whipped and shot a male individual in the residence.
> He also shot a female in the residence two times, and stole
> between $500-$600 from her.  Farmer was charged for this
> crime in Lake County, Indiana under cause number 45G02-
> 0904-FC-38.  The case was dismissed pursuant to a plea
> agreement where he pled to two separate cases.  The reports
> pertaining to this incident were turned over to defense
> counsel on May 30, 2017, and January 2, 2018.

[DE 1390 at 4.]

Farmer's argument that this evidence was inadmissible 404(b) evidence

introduced merely to suggest that Farmer's 2009 attempted murder of Coffman was in

conformity with the murders of Siegers and Lowery lacks merit.  Indeed, I  think the

attempt to characterize this evidence as 404(b) evidence is off point.  *See United States v.*

*Guerrero*, 768 F.3d 351, 365 (5th Cir. 2014) (holding "evidence of an uncharged offense

arising out of the same transactions as the offense charged in the indictment is not

extrinsic evidence within the meaning of Rule 404(b)").  The testimony elicited from

Coffman was relevant to show that Farmer was part of the Latin King conspiracy and

that he engaged in conduct to further its objectives.  In other words, it was direct

evidence of the RICO conspiracy charge.

Even if I did analyze this testimony under Rule 404(b), it would still be permissible.  Rule 404(b) bars the admission of evidence of other crimes, wrongs or acts, "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Although the Seventh Circuit used to employ a four-part test governing the admissibility of "other acts" evidence, this was revised in *United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014) for "a more straightforward rules-based approach."  After *Gomez*, a proponent of Rule 404(b) evidence "must first establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way."  *Id.* at 860. As I mentioned before, the testimony about robbing and shooting Coffman (who was associated with a rival gang and dealing drugs in the Latin King's territory), is proof in support of Farmer acting on behalf of the Latin Kings and engaging in acts to further that conspiracy.

Although the Seventh Circuit has recognized that gang evidence can be troublesome because of the negative connotations it evokes, it "ha[s] consistently held that, under appropriate circumstances, gang evidence has probative value warranting its admission over claims of prejudice."  *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996).  In particular, gang-related evidence may be admitted "to demonstrate the existence of a joint venture or conspiracy and a relationship among its members." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997).  Here, Coffman's testimony did just that - it showed that Farmer was a part of the Latin Kings gang and acting on

their behalf and to further their interests.

I note that if this was impermissible 404(b) testimony, as Farmer insists, Farmer has another problem. Farmer's counsel did not object to the government calling Coffman at trial. [Tr. 500.] The Seventh Circuit has held where a defendant did not object at trial to the admission of evidence under Rule 404(b), the issue was waived on appeal. *See United States v. Medina*, 755 F.2d 1269, 1275-76 (7th Cir. 1985). During her testimony, Mr. Mitchell did object to the more narrow issue of the relevance of Coffman's testimony about her lasting physical impairments due to being shot by Farmer, and I found that Coffman had a right to describe the consequences of being shot, but then said, "[b]ut I think we've heard enough. Any more beyond this, the probative value of it is going to be outweighed by any danger of unfair prejudice, and so - - I'm going to cut it off at this point." [Tr. 529.] In other words, I was cognizant of the line, and cut off any testimony about Coffman's enduring injuries which would have been unduly prejudicial.

Regarding his former girlfriend's testimony, on November 5, 2018, the government provided Farmer with Malinauskas's grand jury testimony relating to Farmer distributing kilograms of cocaine. [DE 2713 at 48.] Thus, he had plenty of notice that this testimony could be introduced at trial. Additionally, while counsel filed a motion in limine to bar any opinion testimony of witnesses Tiffany Malinauskas, Jason Gibbs, Glen Kok, and/or Edward Januszewski concerning Farmer's propensity to commit violent acts or engage in violent conduct [DE 1981 at 4], counsel did not object

31

on this basis to Malinauskas's testimony at trial.  Moreover, the fifth superseding indictment specifically charges in Count 2 that Farmer knowingly and intentionally possessed with intent to distribute "five (5) kilograms *or more* of a mixture and substance containing a detectable amount of cocaine." [DE 1819 at 28 (emphasis added).]  Thus, Malinauskas's testimony that she went on drug runs with Farmer and that Farmer picked up about 15 kilos of cocaine in her presence [Tr. 1204-06] is direct evidence that Farmer was distributing cocaine.

To the extent Farmer argues the Court constructively amended the fifth superseding indictment when it requested that the government redact any overt acts that were not proved at trial [DE 2503 at 1-5; DE 2505 at 11; DE 2511 at 3; DE 2512 at 101; DE 2513 at 58-60; DE 2546 at 2; DE 2610 at 12], this is also meritless.  Farmer insists that in order to redact the indictment, the government should have gone back to the grand jury.  But redacting the indictment at the end of trial is quite common when we give the jury a copy of the indictment for their consideration during deliberation. The point of redacting the indictment the jury received for its consideration was to protect Farmer from the prejudicial allegations in the indictment that were not referenced during the trial.  What's more, jurors would surely have been flummoxed reading an indictment with allegations they had never heard about. But Farmer is now trying to turn the issue on its head.  Here's how the issue developed. At the close of the evidence, during a conference with the parties, I stated:

> I have a question for the government.  There's a lot of stuff
> in the Indictment that didn't come up in the trial, lots of - -

> so does the government have a proposed redacted
> Indictment that we're going to submit to the jury so that as
> they review the evidence in the case? . . . taking all the other
> people out of the caption and . . . I don't want stuff in there
> that we didn't hear anything about.  It just wouldn't make
> any sense.

[Tr. 1916.] After making the redactions, the government provided a copy to Farmer's counsel and the Court, and the jury eventually got a copy of the redacted version for deliberation.

While it is true that material amendments to an indictment must be made by re-submission to the grand jury, that was not necessary in this case because the changes to the fifth superseding indictment were *removing* allegations having no bearing on Farmer. It was done for his protection and there was therefore no prejudice to Farmer. *See United States v. Lorefice*, 192 F.3d 647, 653 (7th Cir. 1999) (ruling the government could properly drop paragraphs alleging that defendant gave kickbacks to co-conspirator without re-submission to grand jury, acknowledging "the Supreme Court expressly held that to drop from an indictment allegations that are unnecessary to an offense clearly contained within it does not unconstitutionally amend the indictment"); *United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir. 1991) (finding "allowable narrowing" of indictment where the change is merely a matter of form or where the government proves a more limited verison of the charges outlined in the indictment reasoning "[n]o offense not charged in the original indictment has been added, and no possible basis for conviction not contained in the original indictment has been created.").

In sum, I'm perplexed by this argument.  I fail to see what harm the redaction of prejudicial paragraphs of the indictment that were not proven at trial could have caused Farmer — it isn't like the government *added* allegations to the indictment, it merely redacted certain allegations that were not proved or even mentioned at trial.  (Recall that this case has 38 defendants but Farmer was tried alone for reasons explained above.) The indictment was redacted at my request so that it would make more sense when jurors were reviewing it during their deliberations.  In other words, the allegations not proven during trial were ordered removed to avoid confusion and any prejudice to Farmer.

Farmer also claims a new trial is required due to prosecutorial vindictiveness. [DE 2405 at 2-10; DE 2503 at 9; DE 2513 at 7; DE 2528 at 8.]  Specifically, he claims that after he rejected four separate plea agreements, the AUSA acted with prosecutorial vindictiveness when it charged him with additional crimes (including the two murders) in the fifth superseding indictment.  To succeed on such a claim, Farmer would have to affirmatively show through some objective evidence that the prosecutorial conduct was motivated by some kind of animus.  *See United States v. Spears*, 159 F.3d 1081, 1087 (7th Cir. 1998).  Farmer has not offered any evidence to raise a doubt as to whether the government acted properly in this case.  It is perfectly permissible for the government to "threaten[] a defendant with increased charges if he does not plead guilty, and follow[] through on that threat if the defendant insists on his right to stand trial." *United States v. Tingle*, 880 F.3d 850, 856 (7th Cir. 2018) (quoting *Alabama v. Smith,* 490 U.S. 794,

802 (1989)).  As such, this argument is also unavailing.  To the extent Farmer alleges

other prosecutorial misconduct and "outrageous" government action in other filings,

his theories are all nothing more than speculation.

Farmer's next basis for a new trial is that I erred when I refused to give the jury

the instruction tendered by the defense regarding the "corroboration rule." [DE 2405 at

10-12.]  Mr. Mitchell makes the same argument in his motion for a new trial.  [DE 2291

at 13-15.]  Farmer's defense counsel requested the following instruction at trial:

> A defendant's uncorroborated confession, standing alone, is
> insufficient to support a conviction.  Under the
> corroboration rule, the government must provide substantial
> independent evidence which would tend to establish the
> trustworthiness of the statement.  The government can meet
> this burden by introducing evidence that supports some of
> the confession's key assertions.  This objective is met when
> the government presents evidence showing that the
> defendant's statement as a whole is trustworthy.

[DE 2152 at 2; Tr. 1910.]  In response to defense counsel's argument that this instruction

was essential, here's what I said on the record:

> I really disagree with that, respectfully.  I mean, let's step
> back for a second.  This is really an issue for the Court to
> decide at a Rule 29.  If the government is attempting to
> convict somebody on the uncorroborated confession or
> admission of a defendant, I would direct the case out
> because there would be insufficient evidence.  It's really not
> a jury question.  Once there's sufficient evidence to submit
> the case to the jury, I think this issue becomes unimportant
> and really irrelevant.  In all events, there isn't just an
> uncorroborated admission in this case.  There are several
> admissions that corroborate one another.

[Tr. 1912-13.]

I stand by this reasoning.  Aside from Farmer's statement that he made to the detective during the booking process, there was also evidence at trial that Farmer made incriminating statements or admissions about the murders to several other people including Glen Kok, Jason Gibbs, Tiffany Malinauskas, Robert Davis, and Jimmy Gilliam.  *See United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988) (stating "certainly the failure to give an instruction on corroboration could not have been plain error . . . since [defendant's] admissions were well corroborated . . . .").

I also cited the case of *United States v. McDowell*, 687 F.3d 904 (7th Cir. 2012), during the instruction conference, and I still think that case says I do not have to instruct the jury on the requirement of corroboration. [Tr. 1913.] In finding the district court did not abuse its discretion in denying the defendant's request for a corroboration instruction, the Seventh Circuit reasoned in *McDowell*:

> But we have held that the district court is not obligated to instruct the jury on the requirement of corroboration.  *United States v. Howard*, 179 F.3d 539, 543 (7th Cir. 1999).  Following the lead of two other circuits, we concluded in *Howard* that the matter was better left to the trial judge, and that the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient.  *Id.* at 544.

*McDowell*, 687 F.3d at 912.  This reasoning is sound, the general instructions in this case were sufficient, and there was no error when I refused to instruct the jury on the corroboration rule.

One of Farmer's most repeated arguments is that I erred in denying his motion to suppress the eyewitness sketch. [DE 2392 at 2-4; DE 2503 at 13-14; DE 2504 at 109-22; DE

1505 at 15-16; DE 2506 at 5-35; DE 2512 at 107-14; DE 2539 at 1-10; DE 2616 at 1-17; DE

2751 at 30.]  Farmer insists the sketch is "unduly suggestive," he has issue with only one

witness (Clarissa Holodick) having been asked to compile the sketch, questions how she

could have accurately seen a person from the distance she was at, disputes the manner

in which the computer-generated sketch was created, and thinks the authorities

somehow led Holodick in her description of him or even showed her a photograph.

All of these arguments were already addressed and rejected.  There was

extended briefing on this issue (including supplemental briefs after the parties visited

the scene and took photographs that were presented to the court), and I held a lengthy

hearing on the motion to suppress on May 13, 2019, at which ATF Special Agent Eric

Ellis and Clarissa Holodick (the postal worker who saw Farmer fleeing from the

direction of the auto body shop), testified.  I found Ms. Holodick's testimony very

persuasive and credible.  I issued an exhaustive opinion and order on June 7, 2019,

denying the motion to suppress the sketch [DE 2093].  I stand by the reasoning in that

order, and Farmer has not pointed to any new facts or legal argument to call into

question anything in that ruling.

Sticking with the topic of suppression, Farmer also argues the government

committed perjury when it stated in its response to the motion to suppress that the two

other eyewitnesses did not have any knowledge to share with the sketch artist. [DE

2392 at 1-3, 5, 8; DE 2405 at 31-36; DE 2503 at 7; DE 2504 at 122-25; DE 2506 at 20-24; DE

2528 at 5; DE 2539 at 11-15.]  I addressed these two other witnesses, D.M. and F.H., in

my order. [DE 2093 at 7.]  When asked at the scene if F.H. could recognize the suspect

again if he saw him, he replied, "I did not see his face." [DE 2023-2 at 2.]  Additionally,

D.M. told officers she did not get a look at his face and "[she] could not see his face."

[D.M. witness statement, DE 2023-1 at 2.]  Farmer points to a subsequent interview,

which happened approximately two years *after* the murders, when F.H. told a detective

during a photo line-up that "he caught a quick glimpse of his face." [DE 2405 at 33.] But

this statement, taken much after the fact, has no bearing on whether the identification

procedure used with Clarissa Holodick was unduly suggestive, and it certainly doesn't

prove that the government committed perjury in drafting its response.

Although Farmer's next argument is entitled improper misjoinder, he seems to

be arguing that venue is improper.  Farmer states he was charged in the wrong Latin

King racketeering conspiracy because the Southeast Region of the Latin Kings were in

control of the Indiana Latin Kings during the time that the murders and many other

overt acts occurred. [DE 2403 at 13; DE 2405 at 61-63; DE 2604 at 96-98; DE 2505 at 17;

DE 2507 at 12-15; DE 2509 at 13-15; DE 2510 at 13-15; DE 2511 at 64-67; DE 2540 at 23-25;

DE 2543 at 229-30; DE 2610 at 13-40; DE 2645.] In other words, Farmer believes he

should have been prosecuted in Illinois, because he claims the murders didn't have

anything to do with the Indiana Latin Kings.  To the contrary, venue is appropriate in

this case.

It is well settled that Article III of the United States Constitution guarantees the

right to be tried where the crime was committed.  U.S. Const. Art. III § 2, Cl. 3.  Plus the

federal rules provide the prosecution shall be in the district in which the offense was committed.  Fed. R. Crim. P. 18.  In a criminal RICO conspiracy claim, like this one, "venue is proper in any district in which an overt act of the conspiracy occurred, even if there is no evidence that the defendant ever entered that district or that the conspiracy was formed there."  *United States v. Firtash*, 392 F.Supp.3d 872, 880 (N.D. Ill. 2019) (quotation omitted); *United States v. Rodriguez*, 67 F.3d 1312, 1318 (7th Cir. 1995) (venue "lies in any district in which an overt act in furtherance of the conspiracy occurred."). There are multiple sets of the Latin Kings, and Farmer belonged to sets in Hammond and Gary, Indiana.  There was plenty of testimony at trial that Farmer committed multiple overt acts in furtherance of the conspiracy in the Northern District of Indiana. Therefore, venue is proper in the Northern District of Indiana.

For his final basis for a new trial, Farmer argues his defense counsel was ineffective in his pretrial and trial performance. [DE 2347 at 2; DE 2392 at 2-3; DE 2405 at 60; DE 2503 at 15; DE 2504 at 93; DE 2507 at 12; DE 2509 at 9-10; DE 2510 at 9-12; DE 2511 at 11; DE 2540 at 9-10; DE 2543 at 221; DE 2547 at 28.] While this claim is typically pursued in a section 2255 motion, a defendant may proceed on these grounds in a Rule 33 motion.  I pause to caution Farmer that where a defendant brings an ineffective assistance of counsel claim on direct appeal, "he will be barred from collaterally attacking his conviction on these same grounds." *United States v. Miller*, 795 F.3d 619, 630 n.5 (7th Cir. 2015); *United States v. Flores*, 739 F.3d 337, 341 (7th Cir. 2014) ("[W]e have said many times that it is imprudent to present an ineffective-assistance argument

on direct appeal.").

To succeed on a claim of ineffective assistance of trial counsel, Farmer must show that counsel's representation both fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceedings would have been different had the unprofessional errors not occurred. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance, and "[s]urmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The question isn't whether the representation deviated from the best practice, but whether it amounted to incompetence under "prevailing professional norms." *Harrington*, 562 U.S. at 105. Regarding the prejudice prong, in showing there is a reasonable probability that, but for counsel's errors, the results of the proceedings would have been different, "[a] reasonable probability is defined as one that is sufficient to undermine confidence in an outcome." *Adams v. Bertrand*, 453 F.3d 428, 435 (7th Cir. 2006).

The first basis for ineffective assistance is that Farmer's counsel failed to argue and file all of the motions Farmer wanted him to file. [DE 2347 at 2; DE 2503 at 15; DE 2511 at 2.] However, in order to succeed, Farmer must "prove the motion was meritorious." *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017) (quotation omitted); *see also Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) ("an attorney is not ineffective for failing to raise a meritless argument."). Farmer has not provided any

facts about these motions he wanted his counsel to file, and there is nothing to suggest any of them would be meritorious.  Thus, this claim fails.

Farmer also faults his counsel for failing to cite any case law for his pretrial motions. [DE 2347 at 2; DE 2503 at 15; DE 2511 at 2; DE 2543 at 221.] This allegation is simply not true.  Defense counsel did cite case law in his pretrial motions (for example, the motion to sever and the motion to suppress). [*See* DE 2009, DE 2019.]  Just because I ultimately ruled against Farmer on these motions does not mean that his counsel was ineffective.

Next, Farmer criticizes his counsel for failing to call the two other eyewitnesses (F.H. and D.M.) at the hearing on the motion to suppress. [DE 2392 at 2; DE 2543 at 221.] As I discussed earlier in this opinion, my analysis of the admissibility of the sketch that Clarissa Holodick helped construct did not turn on the testimony of the two other eyewitnesses who observed someone flee from the Calumet Auto Rebuilders.  I analyzed the propriety of her identification and creation of the sketch at length, and Farmer has not showed that failure to call the two other eyewitnesses resulted in prejudice to him.

Farmer also claims his defense counsel was ineffective because he failed to investigate perjury committed by the Assistant United States Attorney relating to the government's response to the motion to suppress. [DE 2392 at 3.] As discussed above, the government did not commit perjury in its response, and the motion to suppress did not revolve around other eyewitness testimony.  Farmer has once again failed to show

that his counsel's actions caused any prejudice to him.

Farmer also criticizes his defense counsel for not locating other witnesses who provided statements that identified other murder suspects. [DE 2405 at 60; DE 2504 at 95; DE 2507 at 12; DE 2509 at 9-10; DE 2510 at 9-12; DE 2540 at 10; DE 2547 at 28.] This allegation is simply factually incorrect.  Mr. Mitchell *did* present evidence during the trial of other suspects.  For example, defense counsel highlighted that a person named Bryan Rudnick was a suspect early in the investigation, and elicited testimony regarding a photograph of Bryan Rudnick wearing sunglasses that looked similar to the ones recovered from the scene. [Tr. 1686, 1787.]  Farmer's speculation about other suspects provides no concrete evidence to show that he was prejudiced by the actions of his counsel.  Moreover, trial decisions like the one Farmer is criticizing (like deciding how many other suspects to point the finger at), are strategic decisions left to the purview of defense counsel.  *See Hicks v. Hepp*, 871 F.3d 513, 525 (7th Cir. 2017) (finding that under *Strickland*, there is "significant latitude for permissible attorney conduct," and courts presume "the challenged action might be considered sound trial strategy.")*; Moore v. Casperson*, 345 F.3d 474, 490 (7th Cir. 2003) ("S*trickland* permits counsel to make strategic decisions and this decision appears to fit well into that category.").  Farmer has not overcome the presumption that this was sound trial strategy, and it did not prejudice Farmer.

Farmer also alleges that his counsel failed to highlight an inconsistency between witnesses testimony.  Specifically, he argues counsel should have emphasized that

several witness statements that the murders were gang related were inconsistent with

Malinauskas' testimony that Farmer committed the murders for money to buy drugs.

[DE 2405 at 60; DE 2504 at 95; DE 2507 at 12; DE 2509 at 9-10; DE 2510 at 9-12; DE 2540 at

10; DE 2547 at 28.]  Once again, this seems to be a sound strategic trial choice.  *See United

States v. Shukri*, 207 F.3d 412, 418 (7th Cir. 2000) (reiterating that the *Strickland* test is

"highly deferential to counsel, presuming reasonable judgment and declining to second

guess strategic choices."); *see also Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990)

(warning the court must not become a "Monday morning quarterback.").  While there

were some inconsistencies between the different witnesses' testimony about why

Farmer committed the murders, Farmer's defense counsel seemed to adopt a

straightforward approach for the entire trial: arguing that none of the witnesses should

be believed because Farmer did not commit the murders.  Spending time highlighting

inconsistencies could have inadvertently sent the jury the signal that Farmer *did* commit

the murders.  Therefore, I don't think this trial strategy was unreasonable.  And once

again, Farmer has no evidence showing this choice prejudiced him.

Farmer's last argument concerning ineffective assistance is that his defense

counsel erred in deciding to call Latin King member Alexander Vargas to testify on his

behalf. [DE 2405; DE 2509 at 7; DE 2540 at 17; DE 2547 at 27.]  Not to sound like a broken

record, but once again this falls into the category of sound trial strategy.  Vargas, who

was elevated in rank to the Regional Inca, testified that he only met Farmer once, and

Farmer did not hold any rank in the gang. [Tr. 1435, 1443, 1447, 1450.]  Defense counsel

was clearly trying to show that Farmer was not a member of the conspiracy and I cannot say the decision to call Vargas to testify constituted ineffective assistance of counsel.

In sum, I will not view defense counsel's performance through the lens of the proverbial Monday morning quarterback. From my point of view, Farmer's defense counsel did not provide ineffective assistance of counsel. Far from it. Mr. Mitchell filed numerous motions on Farmer's behalf, he appeared in my court on a number of occasions, he was extremely professional, and was well prepared on a case with an enormous amount of discovery material. His arguments were well thought out and often persuasive. At trial, Mr. Mitchell and Mr. Brandstrader vigorously argued on Farmer's behalf - they conducted cross examinations, put on their own witnesses, and seemed to have a good rapport with the jury. Farmer has not proven that his counsel were deficient, or that there is a reasonable probability that the result of the proceedings would have turned out differently had his counsel performed differently.

To the extent Farmer requests a hearing on the ineffective assistance of counsel claim [DE 2532], this is denied. A petitioner is only entitled to an evidentiary hearing on a claim for ineffective assistance of counsel if he has alleged "facts that, if proven, would entitle him to relief." *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016) (quotation omitted). Here, Farmer's conclusory allegations are insufficient. *Id.*

Moving on to the next basis for a new trial, Farmer repeatedly argues that his counsel had an "actual conflict of interest" because Mr. Mitchell represented him as

well as Ruben Porraz, a Latin King charged in a southeast region RICO prosecution in

the Northern District of Illinois. [DE 2400 at 1-2; DE 2403 at 1-4; DE 2405 at 66-67; DE

2504 at 62-63; DE 2507 at 4-6; DE 2509 at 4-6; DE 2510 at 406; DE 2511 at 5-8; DE 2540 at

15-16; DE 2543 at 222; DE 2547 at 22-25.]  Farmer relies upon a case from the Second

Circuit, *United States v. Arrington*, 941 F.3d 24 (2d Cir. 2019).  *Arrington* is easily

distinguishable.  In that case, Arrington was charged with his co-defendant, Aaron

Hicks, with the same RICO conspiracy.  It was brought to the court's attention that

Arrington's counsel previously represented Hicks in a state court matter that was

referenced as an overt act in the superseding indictment.  The *Arrington* court reasoned

that "[w]here an attorney suffers from a waivable actual or potential conflict, the district

court must conduct a *Curcio* hearing to determine whether the defendant will

knowingly and intelligently waive his right to conflict-free representation."  *Id.* at 40.

But the facts in this case are totally different.  Farmer and Porraz were not co-

defendants in the same RICO conspiracy, and Farmer's RICO conspiracy does not

include any overt acts committed by Porraz.  Other than his mere speculation, Farmer

does not articulate any conflict of interest concerning his counsel.  I don't see how Mr.

Mitchell representing Porraz in an Illinois case involving another RICO conspiracy

would create any prejudice whatsoever to Farmer or how this would adversely effect

his attorney's performance.

 To the extent Farmer has requested a hearing on the conflict of interest issue [DE

2403; DE 2510 at 4; DE 2511], this is denied because a hearing is not necessary.  "The

determination of whether a hearing is required [on a conflict of interest issue] is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard." *United States v. Anderson*, 288 F.3d 335, 337 (7th Cir. 2002) (quoting *United States v. Losing*, 539 F.2d 1174, 1178 (8th Cir. 1976)).  There are no facts that need to be unraveled here, and Farmer's mere speculation that a conflict exists is not enough to warrant a hearing.

So far, I've tried to address the main arguments Farmer set forth in his multiple motions supporting a new trial.  But, there's more.  There are many instances of Farmer making a single statement without including any citations, case law, or other support for his claims.  The government argues that these issues are waived, and I agree.  *See United States v. Slade*, 980 F.2d 27, 30-31 (1st Cir. 1992) ("Passing allusions are not adequate to preserve an argument," and this Court is "not expected to be [a] mindreader[]" or "cull . . . testimony in search of promising factual scenarios or to hunt for attractive legal arguments not articulated in the motion papers"); *United States v. Cantrell*, No. 2:07-cr-44, 2008 WL 4998370, at *6 (N.D. Ind. Nov. 20, 2008) (denying motion for new trial on basis that "[d]efendant's four-paragraph Rule 33 motion, which does not contain a single legal citation, fails to meet his responsibility of developing arguments and presenting grounds to grant the relief requested."); *see also Wiegard v. Smith*, No. 04-419-CJP, 2007 WL 853982, at *2 (S.D. Ill. Mar. 19, 2007) (denying motion for new trial where "defendant's motion consists primarily of a laundry list of

perfunctory points, none of which serve to demonstrate grounds for a new trial."); *United States v. Andry*, No. 13 CR 843, 2015 WL 13439795, at *1 (N.D. Ill. Sept. 28, 2015) ("the laundry list of errors are not developed so the objections are waived.").

Even if these additional arguments are not deemed waived, Farmer's multiple motions for a new trial would fail on the merits in any event. I will address a few of his unsupported contentions, just to keep the record clean. But in the event I have missed any, I state unequivocally that a new trial is not warranted in this case. Farmer's assertion that there was a confrontation clause violation [DE 2506 at 1-4; DE 2538 at 1-3] fails because Detective Grabowski testified at trial and was cross-examined. Farmer's mention of a *Batson* violation [DE 2611 at 4] fails because I properly conducted voir dire and selected a fair and impartial jury. Farmer's *Brady* violation claim [DE 2528 at 1-2] fails because the government properly redacted portions of a proffer involving co-defendants as the redacted portion was not favorable to Farmer's defense or material to him. Farmer has come nowhere near meeting his heavy burden of showing that the verdict is so contrary to the weight of evidence, that a new trial is required in the interests of justice. *Chambers*, 642 F.3d at 592. Consequently, the motion for a new trial is denied.

Finally, to the extent I have inadvertently not addressed an argument that Farmer set forth in any of his voluminous pleadings regarding his motion for acquittal or motion for a new trial, I state now for the record that I have gone through all of those filings with great care. And I remain firmly convinced that Farmer received a fair trial

and that he is not entitled to judgment of acquittal or a new trial.

## Conclusion

For the reasons set forth above, the motion for new trial filed by Farmer's former counsel [DE 2291] and the associated motions filed by Farmer, pro se, for a judgment of acquittal and new trial [DE 2347, 2392, 2400, 2403, 2405, 2423, 2504, 2505, 2506, 2507, 2509, 2510, 2511, 2512, 2513, 2528, 2529, 2532, 2538, 2539, 2540, 2543, 2546, 2547, 2610, 2611, 2616, 2637, 2638, 2639, 2640, 2641, 2642, 2643, 2644, 2645, 2648, 2651, 2655, 2656, 2657, 2658, 2659, 2664, 2668, 2669, 2671, 2672, 2680, 2681, 2682, 2684, 2690, 2703, 2704, 2708, 2714, and 2751] are all DENIED.  Farmer's pro se: motion to exceed the page limit on his amended Rule 29/Rule 33 motion [DE 2387], and Motion to Supplement his Rule 29, Rule 33 Motion [DE 2399] are both GRANTED.

SO ORDERED.

ENTERED: October 6, 2020.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT